UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) |
| v. | ) Cause No. 1:23-cr-00082-TWP-KMB |
| ALEXANDER CLARK, | ) |
| Defendant. | ) |

### SENTENCING MEMORANDUM OF THE UNITED STATES

Over the past few years, the primary tool of violent crime has evolved. The emergence of machinegun conversion devices (or "MCDs") has given shooters on the street new ability to wreak havoc within our nation's communities. Technology has greatly advanced this evolution—from professional manufacturing facilities all the way down to anyone with a few hundred dollars to spare on a simple 3-D printer.

As became apparent in the summer of 2022, Alexander Clark fit within the latter type. By then, Clark had not only amassed a significant firearms collection—some of which he illegally possessed—but also the skill and materials to mass-produce MCDs and other firearm parts, with a little help from the internet and his 3-D printer. He would ultimately use this skill for his own profit, without concern for the repercussions.

No doubt, Clark presents a significant challenge for the Court in fashioning a sentence that is sufficient, but not greater than necessary, to comply with the purposes of federal sentencing law. On one hand, he lacks any meaningful criminal history and faces/has faced substantial personal hardships. On the other, Clark's

unhealthy obsession with firearms, along with his ability and willingness to construct new guns and the ways to make them even deadlier, serves to put the community at risk.

Believing these competing interests to be in equipoise, the government respectfully requests to the Court to sentence Clark to a sentence of 46 months imprisonment, on the low end of his established guideline range.

### I. The Offense Conduct

In the spring and summer of 2022, Clark became the target of an investigation by the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF). PSR ¶9. The ATF learned through the Columbus Police Department (CPD) that Clark was selling privately made firearms (or "PMFs", sometimes called "ghost guns" as they have no serial number and are generally untraceable) that he manufactured in his home with the use of a 3-D printer. PSR ¶10. A confidential source working with the CPD made specific purchases of and pre-orders for PMFs. PSR ¶¶10-11.

Eventually, the ATF assumed control and inserted an undercover agent (UC) to conduct additional PMF purchases. PSR ¶11. In addition to the PMFs (which were Glock-style pistols as requested by the UC), Clark also advertised a fully automatic MAC-10 machinegun for sale. *Id.* The UC made an order for three more PMFs, and in August 2022 Clark and the UC met again to conduct what would be their final business before Clark's arrest. PSR ¶11-12.

During the last transaction between him and the UC, Clark not only handed over the previously ordered PMFs, but also a couple of the MCDs he printed in the meantime. PSR ¶12. The MCDs were drop-in "auto sears" which are used to convert

semiautomatic rifles into machineguns as well.[1]  *Id.*  Clark took the cash and went home.  *Id.*

The ATF applied for and was granted a search warrant into Clark's home.  PSR ¶13.  Inside, they located dozens of firearms (to include machineguns), MCDs, silencers, electronic devices, a 3-D printer, plastic printing filament (the 3-D printer's "ink"), thousands of rounds of ammunition, and jigs (kits consisting of tools, templates, and mounting points used in firearm manufacturing).  PSR ¶14.  See photos below for a glimpse of the scope of this seizure.




*Figure 1: 3-D Printer and Plastic Filament*   *Figure 2: Laptop with image schematics for the 3-D printing of a PMF "lower" frame of a Glock-style pistol (Polymer 80 Glock 19 design)*

---

[1] Another common MCD, of which several were found in Clark's home in August, is a "switch," a small device used for converting the Glock-style PMFs (or any other Glock) into a machinegun.

3



*Figure 3: image of laptop with website for downloadable program to manufacture Glock MCD*



*Figure 4: sample of collection of switches, pre-assembly, recovered from Clark's home.*



*Figure 5: Polymer 80 kits/jigs, which essentially provide the framework for the creation of the lower part of a Glock-style PMF (grip, magazine well, trigger, trigger guard, and receiver)*



*Figure 6: Drum magazine with rifle ammunition. This photo is merely a representation of the ammunition found in Clark's home, which totaled approximately 2,500 rounds.*

4



*Figure 7: Collection of firearm suppressors (or "silencers")*



*Figure 8: Additional recovered auto sears for conversion of a rifle into a machinegun*



*Figure 9: Collection of firearms, PMF and otherwise.*



*Figure 10: Collection of firearms, continued. Includes machineguns as defined by federal law (circled).*



*Figure 9: Collection of rifles recovered*



*Figure 10: an Uzi submachinegun and an AR rifle converted to a machinegun by use of an MCD auto sear*

5

When questioned, Clark admitted to the possession and the manufacture of the PMFs and MCDs. PSR ¶15. He told the agents that he taught himself how to make these items just by looking online. *Id.* Clark further admitted to making the recovered silencers. *Id.*

In total, Clark possessed seven machineguns, 27 MCDs (of the Glock Switch/Auto Sear variety), and seven silencers. PSR ¶ 16. None of these had been legally registered. PSR ¶ 17.

## II. The Applicable Legal Standard

The advisory Guidelines range serves as "the starting point and the initial benchmark," for a Court's sentencing determination. *Gall v. United States*, 552 U.S. 38, 49 (2007). After determining the appropriate Guidelines range, the Court considers the factors set forth in 18 U.S.C. § 3553(a). *United States v. Hurt*, 574 F.3d 439, 443 (7th Cir. 2009). "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661.

## III. Machinegun Conversion Devices

For decades, fully automatic machineguns were expensive, difficult to obtain, and rarely used to commit serious crimes. This has changed in recent years, thanks to small devices colloquially known as "switches" (for installation in Glock-style pistols) or "sears" (for installation in semi-automatic rifles).

An auto sear converts a semiautomatic gun into a weapon capable of emptying an entire magazine with a single pull of the trigger. Conversion devices can be installed in many types of handguns or rifles, but they are particularly common for Glock handguns. A pistol equipped with a conversion device can fire up to 1200 rounds per minute – a faster rate of fire than the standard M-4 machinegun issued to U.S. military servicemembers.[2]

Advances in 3-D printer technology, combined with online global commerce and social media, have made it possible to create a deadly machine gun from the comfort of your living room. Conversion devices can be printed at home, as Clark did, or they can be ordered online for as little as $20.[3] Installation is simple, using readily available instructional videos on platforms like YouTube and Instagram.[4]

According to the ATF, the number of guns with switches seized nationwide increased more than five times from about 300 in 2020 to 1,500 in 2021.[5] These homemade machineguns are adding even more fuel to the fire that is American gun violence, making shootings more deadly and creating added risks for bystanders. Not only can more bullets hit a victim in a shorter amount of time, but the rapid-fire also makes the gun more difficult to control.[6] This can result in bullets spraying across a larger area and hitting more people than just the intended target.

---

[2] https://www.justice.gov/usao-ndtx/pr/fort-worth-manufacturer-charged-glock-switch-case
[3] Alain Stephens and Keegan Hamilton, *The Return of the Machine Gun*, March 24, 2022, *available at* https://www.thetrace.org/2022/03/auto-sear-gun-chip-glock-switch-automatic-conversion/.
[4] *Id.*
[5] *Id.*
[6] *Id.*

Shootings across the country bear out this deadly trend. In September of 2021, a man with a gun modified with a switch fired at two police officers in Houston, Texas, killing one and injuring another.[7] In April of 2022, one of the gunmen in a mass shooting in Sacramento, California, carried a gun outfitted with a switch; that shooting left six people dead and 12 people injured.[8] Also in April 2022, nine people were shot outside a McDonald's in Chicago, two fatally.[9] The gun used in that shooting was a Glock 19 outfitted with a switch and an extended magazine, which held 34 rounds of ammunition.

Indianapolis is no exception. The Indianapolis Metropolitan Police Department has noticed an increase in seizures of machine gun conversion devices over the last two years.[10]

---

[7] Florian Martin, *The man who shot and killed an HPD officer last week used an illegally modified handgun, bodycam footage shows.* October 13, 2021, *available at*: https://www.houstonpublicmedia.org/articles/news/criminal-justice/2021/10/13/410787/hpd-cop-killer-used-illegal-switch-to-make-gun-fully-automatic/ .

[8] Dennis Shanahan, *What are auto sears and how are they becoming a rising issue?* April 6, 2022, *available at:* https://fox40.com/news/sacramento-mass-shooting/gun-recovered-at-mass-shooting-scene-had-been-modified/.

[9] Frank Main et al, *In Chicago, handguns turned into high-capacity machine guns fuel deadly violence,* October 28, 2022, *available at:* https://www.npr.org/2022/10/28/1131026241/chicago-handgun-violence-auto-sear-machine-gun.

[10] Dustin Grove, *Police: More people are turning handguns into 'machine guns,',* February 16, 2022, *available at:* https://www.wthr.com/article/news/crime/impd-indianapolis-increase-in-glock-switches-turing-handguns-into-machine-guns/531-2b708f11-32d0-4d5c-a56f-1d9fb6f5ea28.

IV.    **Application of the 3553(a) Factors**

    A. <u>Nature and Circumstances of the Offense and the History and Characteristics of the Defendant</u>. [18 U.S.C. § 3553(a)(1)]

As demonstrated above, Clark's offense has far-reaching implications for public safety, not only in Indianapolis but across the country. In the wrong hands, a person with a gun, enough ammunition, and an MCD can inflict considerable carnage.

What Clark had the ability (and willingness) to do was to dump a newly minted pistol or even machinegun in the lap of anyone who would pay, even if that person was a felon. *See* PSR ¶10. This level of irresponsibility, done solely for the acquisition of profit, can have massive consequences for a community already plagued by gun violence.

As to his history and characteristics, the defense has done an admirable and thorough job of highlighting Clark's attributes, upbringing, and challenges. *See* Dkt. 47-1. Truly, the troubled upbringing paired with the adversity bestowed upon him at birth is an important consideration for the Court.

But underneath all of that, Clark clearly operates with intelligence and understanding as to what it is he creates. When searching his home, agents located seven machineguns, 27 MCDs (of the Glock Switch/Auto Sear variety), and seven silencers. PSR ¶ 16. This was in addition to the 33 other guns and the thousands of rounds of ammunition he possessed. *Id.,* PSR ¶15(vi). Clark is no stranger to firearms and what they can do.

Furthermore, he possessed noteworthy technical savvy, sufficient to build a variety of firearms and firearm parts. Instead of applying that skill towards

9

something legitimate, he instead chose to produce instruments of death, and then subsequently name their price. These are troubling characteristics, and of great concern to the government.

      B. <u>The Need for the Sentence to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment</u>. [18 U.S.C. § 3553(a)(2)(A)]

A term of imprisonment commensurate with the government's recommendation would underscore these sentencing "needs" well. As to the seriousness of the offense, little else needs to be said. The proliferation of firearms and easy-to-use MCDs exponentially increases the risk to individuals, the police, and the public at large. Clark directly contributed (or sought to contribute) to the spread of these items. While nothing violent necessarily occurred here in this case, it is the potential for it that makes Clark's offense as serious as it is.

Promoting respect for the law is another important concern for the Court, and an apt factor to apply here. Clark knew that machineguns were illegal without proper registration, and he knew that he was dealing in firearms to at least one felon. With the respect for the law lacking here, sentencing Clark to the low end of his guideline would emphasize this factor for him.

Finally, the term of imprisonment recommended, though lengthy, is just, particularly considering the foregoing reasons. Overall, these sentencing factors cut well in favor of the government's proposed resolution.

    C. <u>To Afford Adequate Deterrence to Criminal Conduct</u>. [18 U.S.C. § 3553(2)(B)].

Additionally, the government's recommendation in Clark's case would serve a deterrent effect, both generally and specifically. Deterrence is an important factor that the Court may consider. *See United States v. Tounisi*, 900 F.3d 982, 988 (7th Cir. 2018) (describing general deterrence as an appropriate basis for a higher sentence); *United States v. Sunmola*, 887 F.3d 830, 842 (7th Cir. 2018) (similar).

As to general deterrence, a sentence of 46 months imprisonment would demonstrate to individuals similarly situated as Clark that the Court will not tolerate the manufacture and distribution of machineguns into the community. Such a sentence should also have a cognizable effect to deter Clark specifically, particularly given his apparent willingness to engage in these activities with impunity.

    D. <u>To Protect the Public</u>. [18 U.S.C. § 3553(2)(C)]

To the undersigned, the protection of the public is always paramount. While it is true that the ATF seized all of Clark's inventory during the search warrant, there is little impediment for him to pick up where he left off. The latest generation of 3-D printer Clark owned—which at the time was a Creality 3rd generation (PSR ¶14(ii))—retails at [Walmart](#) for just under $600. Furthermore, Clark still possesses the technical expertise as far as fashioning these devices. Coupled with his clear fixation with firearms—evinced at the minimum by the discovery in his home—a sentence without at least some imprisonment term would increase an immediate danger to the people of this district.

## V. Conclusion

The United States respectfully urges the Court to sentence Clark to 46 months imprisonment, followed by any term of supervised release the Court sees fit. The proliferation of ghost guns and MCDs in the street only feed the seemingly never-ending cycle of violence. Clark's actions, whether he knew it or not, put the public at grave risk. A sentence in line with the government's recommendation vindicates this fact, and otherwise conforms with the applicable sentencing factors for the Court to consider. The government's recommendation therefore is meaningful, just, and the appropriate resolution to Clark's case.

Respectfully Submitted,

ZACHARY A. MYERS
United States Attorney

By: /s/Jayson W. McGrath
Jayson W. McGrath
Assistant United States Attorney

<u>CERTIFICATE OF SERVICE</u>

      I hereby certify that on Tuesday, November 14, 2023, a copy of the foregoing document was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

      <u>/s/ Jayson W. McGrath</u>
Jayson W. McGrath
Office of the United States Attorney
10 W. Market Street, Suite 2100
Indianapolis, IN 46204-3048
Telephone: (317) 226-6333
Email: Jayson.McGrath@usdoj.gov